**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **PAUL ROY SMITH, III,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **CIVIL ACTION NO 08-143-KD-M** |
| | ) | |
| **SUNBELT RENTALS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment (Docs. 22, 23, 24), Plaintiff's Response (Docs. 32, 33) and Defendant's Reply thereto (Doc. 34). For the reasons set forth herein, the Court finds that Defendant's motion is due to be **GRANTED.**

**I.    Background**

On March 14, 2008, Plaintiff Paul Roy Smith, III ("Plaintiff") initiated this action for reverse race discrimination pursuant to Title VII of the Civil Rights Act of 1964 as amended and 42 U.S.C. § 2000e, against Defendant Sunbelt Rentals, Inc. (Doc. 1 at 1). Plaintiff asserts that he has satisfied all of the administrative prerequisites by filing a timely Equal Employment Opportunity Commission ("EEOC") Charge of Discrimination and subsequently receiving a Right to Sue letter within 90 days from the filing of the Complaint. (Id.)

Plaintiff is a Caucasian adult male resident of Mobile County, Alabama, over the age of 21 years old. (Doc. 1). Plaintiff was employed as an Outside Sales Representative ("OSR") of Sunbelt, at its Profit Center 15 ("PC15") in Mobile, Alabama, from November 1998 through July 26, 2007. (Id.) See also (Plf's Dep. at 16-17). Plaintiff's OSR responsibilities included making sales calls to existing and potential customers within his assigned territory, for which he was paid a salary and commission. (Plf's Dep. at 19-20). Defendant Sunbelt Rentals, Inc. ("Sunbelt") is a

for profit nationwide corporation doing business in Mobile County, Alabama, which is engaged in the business of renting and selling construction equipment.  (Doc. 9).  Sunbelt's management includes Dave Ladd (Profit Center Manager and Plaintiff's immediate supervisor), Dan Bernard (District Manager), Russ Brown (Regional Vice-President), Larry Cook and Cheryl Black (Sunbelt representatives).  (Cook Dep. at 8; Bernard Dep. at 12; Brown Dep. at 21; Ladd Dep. at 7-8, 32; Black Dep. at 6, 18).  Corey Cooley is not a party to this action; he is an African-American former co-worker of Plaintiff's at Sunbelt (a driver).  (Doc. 1).  Bruce Lott is not a party to this action; he is a Caucasian former co-worker of Plaintiff's at Sunbelt (a driver).  (Doc. 33 at 147-148).

Plaintiff's one count reverse race discrimination Complaint stems from Sunbelt's discipline of Plaintiff and ultimate termination of his employment.  (Doc. 1).  Plaintiff asserts that his termination was unfair and racially discriminatory because similarly situated African-American employees, including Cory Cooley ("Cooley"), were not punished for similar or worse misconduct.  (Doc. 1).  Specifically, Plaintiff alleges that while he was terminated, Cooley (who Plaintiff claims wrongfully accused him of making racial remarks and related behavior) either was not disciplined or was not disciplined sufficiently for violating Sunbelt's zero-tolerance policy for firearms.  (Id.)

A.    **March 2007**

1.    **Plaintiff's Comparator- Cory Cooley**

On March 13, 2007, Cory Cooley ("Cooley") was caught with a gun in a Sunbelt vehicle in violation of Sunbelt's zero tolerance policy for firearms on company property.[1]  (Doc. 33 at 9, SMITH-0067; Brown Dep. at 63-64; Bernard Dep. at 27-28).  Cooley was counseled and instructed

---

[1]  Plaintiff testified that he saw a .38 pistol in Cooley's car door, as he looked through the window of his car on company property and reported the gun to Ladd and Cook; he was told by other employees that Cook later took pictures of the gun through the car window.  (Plf's Dep. at 110-112).

about the Sunbelt policy by management, and on March 14, 2007, PCM/Supervisor Ladd issued him a written warning for "Violation of Company Policy."  (Id.)[2]  As documented in the Warning Form, Cooley explained that he left his gun in the company truck (which was found by another driver) because he normally stored the gun in his personal vehicle but it was in the repair shop.   The Warning Form stated that if the incident is repeated, he would be suspended and/or terminated. Ladd testified that during the meeting, Cooley reported that Plaintiff made a racial comment, referring to him as "y'all people."  (Ladd Dep. at 11-12).  Bernard testified that Ladd told him that Cooley claimed Plaintiff had used a derogatory racial slur and that he was very upset, and so Bernard told Cooley that Sunbelt would conduct a full investigation and "take care of it."  (Bernard Dep. at 12).

## 2. __Plaintiff__

Due to Cooley's complaint, Sunbelt conducted an investigation.  Management (Bernard and Brown) met with Plaintiff to discuss the incident with Cooley, as well as another incident involving Brandy Reese.[3]  (Brown Dep. at 21-25; Bernard Dep. at 10-14, 22-25, 34-36).  Bernard testified that just before the meeting, he had talked with Brown about the Cooley incident, and Brown told him "that's it, we're giving him [Plaintiff] a warning and send him home for two days. This is the final – final warning."  (Bernard Dep. at 36-37; Brown Dep. at 22).  Brown testified that he decided to then address "a list of things" with Plaintiff and coincidentally, the Cooley complaint arose. (Brown

---

[2]  The Form was signed by Ladd on March 15, 2007 and by Cooley on March 19, 2007.  (Id.)

[3]  Brown testified that Plaintiff's treatment of Brandy Reese, an outside (of Mobile) corporate employee who conducted "ride-alongs" to monitor sales effectiveness, was chauvinistic and demeaning, such as telling a customer that "she farted in front of him."  (Brown Dep. at 24).  Bernard testified that he had heard about some problems involving Plaintiff and Reese before March 2007, but was not aware of anyone counseling or disciplining Plaintiff prior to that time.  (Bernard Dep. at 8-9).

Dep. at 22-25).  During the meeting, Brown talked to Plaintiff about his conduct and "our displeasure with it and that we would no longer tolerate it[]" – "[p]articularly the . . . Cooley . . . incident and this incident with the sales effectiveness process where Brandy Reese was his designatee." (Id. at 23-24).  Brown testified that Plaintiff never disputed or denied any of the things that they discussed, but said that he had some problems and was on medication.  (Id. at 25-26).

### a. <u>Sunbelt's Investigation</u>

As part of Sunbelt's investigation, Bernard interviewed every employee involved in, or who witnessed, the incident.  According to Bernard's notes from his interview of Cooley, after being found with the firearm, Cooley accused Plaintiff of making a racially derogatory remark – that Plaintiff referred to Cooley as "y'all" or "you people." (Doc. 33 at 5-7, SMITH-0070-SMITH-0072; Bernard Dep. at 12-16, 27-28; Plf's Dep. at 128 and Ex. 7).  Cooley explained that Plaintiff was showing him how to complete a company form[4] and wrote "what it is" on the form, and when Cooley asked him what that meant, Plaintiff told him "you know 'what it is' – y'all talk like that don't you." (Id.)  (See also Bernard Dep. at 12-14, 22-25, 34-36).  Cooley then said to Plaintiff "y'all, who's y'all," to which Plaintiff responded "you know y'all." (Doc. 33 at 5, SMITH-0070).  Cooley stated that he told Plaintiff that he "did not know who y'all is," and Plaintiff responded "you know, people." (Id.)  According to Bernard's notes from his interview of Plaintiff, Plaintiff explained that he was showing Cooley how to properly complete company paperwork because it had been filled out improperly by another driver (Jason), and he said to Cooley "this is what y'all need

---

[4] The form in question was a Sunbelt "Pickup And Exchange Log" on which Plaintiff wrote "What it is" in the "Description" section.  (Doc. 33 at 10; Plf's Dep. at Def's Ex. 7).  While he was explaining how to properly complete the form, Plaintiff also filled in the blanks, like a template, of what information should go where on the document itself (e.g., in the "Job Address" section he wrote "where you are" and in the "Hour Meter" section he wrote "on machine" etc.).  (Id.)

to do," to which Cooley responded "what do you mean y'all."  (Doc. 33 at 6, SMITH-0071).

Plaintiff said "as in all of us – everybody," to which Cooley asked "what do you mean y'all," and

Plaintiff responded that "it's a southern term."  (Id.)  According to Bernard's interviews with co-

workers who witnessed the incident, they believed that Plaintiff used "a demeaning tone" and that

his comments were "derogatory and racist."  (Id. at 7, SMITH-0072).

Bernard considered what Plaintiff said to Cooley as harassment: "it could be just

[harassment] position to position, sales rep to driver[]" and "[w]hat made it discriminatory is the

tone, the presentation, the word choice."  (Bernard Dep. at 38-39).  Bernard testified that the phrase

offended Cooley and from his investigation and after consulting with Sunbelt's HR Department, he

"deemed it that Corey [Cooley] was offended[]" and it was "harassment."  (Id. at 41, 43-44).  Brown

testified that Plaintiff's use of the phrase "y'all people" was racially incorrect "[i]n the context in

which he used it[]" with Cooley even though this exact phrase had not been brought up to be trained

or warned against using at Sunbelt.  (Brown Dep. at 27-28).

### b.   Plaintiff's testimony

Plaintiff testified that he found out that Cooley had accused him of using the word "y'all"

when Ladd called him on the cell phone and "was laughing" and said "I don't know what you said

to Cory, but you have him really worked up."  (Plf's Dep. at 113).  Plaintiff testified that Ladd told

him that another driver had found Cooley's weapon in a company vehicle on company property

during company time and that while he had been explaining Sunbelt's zero tolerance policy with

firearms, "Cory exclamated that his grandfather was a slave, that he had been persecuted, and that,

oh, by the way, Paul said 'y'all,' and that was racial."  (Id.)  Plaintiff testified that Ladd requested

that Plaintiff return to the office, where he found Cooley standing outside crying and said:

> Cory, I don't know what you think I said, but I didn't say "y'all." I explained it to you when I was explaining the form to fill out, that "y'all" was a southern term. It meant "you all." It meant drivers, mechanics, salesman, managers, anybody that works for Sunbelt . . . they need to fill the paperwork out correctly.

(Id. at 114-115).  Plaintiff testified that Cooley did not say anything but just looked away.  (Id. at 115).  Plaintiff went inside to talk with Ladd who explained that he was "getting on to him [Cooley] while he mentioned that about the zero tolerance of the gun[]" to which Plaintiff said "Oh, so he pulled the race card on me[,] and Ladd said "yeah[,] [t]hat looks like what's happening."  (Id.)  Plaintiff testified that he believed that Cooley claimed that he said a racially discriminatory remark because he was scared of being terminated for having the gun on company property.  (Id.)

Plaintiff testified about the incident with Cooley, explaining that he was filling out a special collections form with Cooley because he was a driver and was present (another driver (Jason) who had not filled out the paperwork correctly was not present and there had been damage to the equipment and a piece was lost and so Plaintiff lost his commission), and as a result, he was instructing Cooley about the proper way for everyone to fill out the forms.  (Plf's Dep. at 116-118).  (See also Bernard Dep. at 59-60).  Plaintiff testified that he was suspended for saying "y'all" and that he did not say "y'all people."  (Plf's Dep. at 58).  Plaintiff explained that he said to Cooley "this is the way y'all need to fill the paperwork out" to which Cooley asked "what do you mean by 'y'all'" and Plaintiff said "it's a southern term, it means you all[,] [i]t means everybody that works at Sunbelt that picks up equipment needs to fill this paperwork out . . . . correctly . . . ."  (Id. at 120).  Cooley told him that he understood.  (Id.)  Plaintiff testified that when he talked with Ladd about the conversation with Cooley and showed him the form; Ladd told him that he did not see "any problems with it." (Id. at 122-123).

**c.**     **The Discipline**

As a result of Sunbelt's investigation of Cooley's complaint, on March 15, 2007, Plaintiff was issued a written warning for "Violation of Company Policy" for "discriminatory harassment-pg 16 Handbook" by PCM/Supervisor Ladd.  (Doc. 33 at 3, SMITH-0068).  As documented in the Warning Form, Plaintiff received a two-day suspension, and he and the staff were counseled in "treating all employees with respect."  The Warning Form stated that if the incident is repeated, Plaintiff would be suspended and/or terminated.  According to Sunbelt, Plaintiff did not dispute anything during the meeting but refused to sign the disciplinary form and stated that he had problems and was taking a medication for bipolar disorder and depression problems, presenting a shoe box full of medication.  (Brown Dep. at 25-26; Plf's Dep. at Ex. 9, SMITH-0058; Bernard Dep. at 34-36).  Bernard and Brown decided, based upon Sunbelt's discrimination and discipline policies, to discipline Plaintiff with the two-day suspension for using a racially derogatory remark towards Cooley.  (Bernard Dep. at 35-36, 51; Plf's Dep. at Ex. 9, SMITH-0058).  Plaintiff testified that after Cooley's accusation, he felt like he "already had a target on his head" because Brown told him that "if there's any more incidents from you, you'll be terminated[,]" and because Brown and Bernard told him – while he was being disciplined – that Sunbelt was afraid of a racial lawsuit.  (Plf's Dep. at 58-59).  Plaintiff testified that Cook told him this as well, after he was suspended, and that Sunbelt was going to "build a case against Cory Cooley to get rid of him" and "needed to make all documents and dot their I's and cross their T's."  (Id. at 59-60).  Plaintiff testified that Cook told him that "you have to be careful about what you say because they will pull – 'they,' a minority will pull the race card or has pulled a race card."  (Id. at 60).

Plaintiff testified that other employees also used the word "y'all" but were not disciplined.

(Id. at 139-141).  Plaintiff testified that he has never heard that use of the word "y'all" is a racial term or derogatory in any way, and that he has never been counseled or instructed by Sunbelt as to what kind of verbiage is wrong.  (Id. at 257).  Plaintiff testified that Brown, Bernard and Cook told him that Sunbelt was "racially unbalanced" and feared repercussions of a race discrimination lawsuit, suggesting that was the reason why Cooley was not terminated.  (Id. at 141-144).

Additionally, Plaintiff testified that there were two other African-American drivers, including one who would "never show up" to work yet was not disciplined (e.g., there were three days at a time that "he would be M.I.A[]").  (Plf's Dep. at 144-146).  Plaintiff testified that he would ask Ladd where the drivers were to deliver equipment and Ladd would not know, stating that "he [this other driver] didn't call in."  (Id. at 146-147).  Plaintiff testified that on numerous occasions he had to come in and deliver equipment that these drivers were supposed to deliver, or that the drivers refused to deliver because they were "taking their lunch break at four o'clock in the afternoon, and they did not want to go on another run."  (Id. at 147-148).  Plaintiff testified that Sunbelt's timekeeper told him that these drivers arrived late to work but wrote times on their time-cards to appear on time.  (Id. at 148).

Moreover, as for Cooley's actions, Plaintiff testified that after his suspension, he was present one day at work when Cooley threatened to go to his vehicle, retrieve his gun and kill everyone at Sunbelt – he heard Cooley screaming in the shop that he had been disciplined "about running into a mailbox or something" and it was then that he realized how much authority Cooley had by Sunbelt not terminating him at that time.  (Id. at 61-64, 129-131).  Plaintiff testified that the other drivers also told him about other actions by Cooley, as they were upset that "he could do no wrong and that he could get away with coming in late, not showing up, falsifying time cards, throwing a fit, violent

behavior, threatening to kill somebody, OSHA being called, Human Resources being called, and nothing is done to him." (Id. at 131-132).  Plaintiff testified that Cooley was not disciplined for swearing at work, nor when, one day, a co-worker, Misty Powell, locked herself in her vehicle because Cooley was behaving violently and swearing and cussing and "out of control." (Plf's Dep. at 211-212).  Plaintiff also testified that Ladd loaned Cooley the company truck to go to and from work for over four months because Cooley's vehicle was broken, but that Cooley did not check the oil and burned the motor up in the truck but "nothing was done to him." (Id. at 212).  Thereafter, a white employee, Bruce Lott, was only allowed to use the company vehicle for a few days at a time and then was told that he had to find another way to work. (Id. at 213).  Plaintiff testified that Cooley had two preventable accidents within a rolling one-year period in which Cooley "tore up somebody's lawn" and "ran over someone's mailbox . . . and tried to deny it." (Id. at 128).  Plaintiff testified that Sunbelt "finally got rid" of Cooley when Cook arranged for a relative to film Cooley during a delivery. (Id. at 132).[5]

Further, former Sunbelt employee Bruce Lott submitted an Affidavit stating that during his employment, he observed occasions where Sunbelt's African-American employees were treated differently than white employees with respect to discipline and similar issues:

> . . . . I observed African-American Sunbelt employee Corey Cooley go completely unpunished for making violent threats to myself, which I reported to Sunbelt's Human Resources.  I also observed him using a Sunbelt company vehicle for personal use for several months, where this was never allowed for white employees. I also observed him and other African-American employees go unpunished for repeatedly falsifying their time-clock entries and reporting late to work.  I observed this misconduct reported to Sunbelt management, and Sunbelt supervisors at Profit Center 15, but nothing was done, and they received no discipline.  For this same type

---

[5] Bernard testified that he was unaware of any prior incidents involving Cooley. (Bernard Dep. at 33-34).

> of misconduct, during my employment I observed white employees receiving prompt
> discipline from Sunbelt, including suspension and termination . . . .

(Doc. 33 at 147-148).  Lott reported threats that Cooley had made to him, to Sunbelt's Human

Resources, and was told that no action would be taken due to a fear of minority lawsuits, but that

they would talk to the managers; however, that was never done.  (Id. at 148).  Lott stated that one

time, Cooley was seen throwing a cell phone and clothes across at Ladd's office, saying that he was

quitting but that Ladd talked him into staying.  (Id.)  Lott stated that after Plaintiff was fired,

"[Sunbelt] rode me hard and placed extra work on me. Corey [Cooley] threatened to kill me in front

of Lewis, nothing was done. I was harassed to the point of ending my employment with them." (Id.)

## B.   July 2007

On July 26, 2007, Plaintiff was issued a Termination Notice and was terminated from his

employment with Sunbelt, by PCM/Supervisor Cook, for "Unacceptable Conduct."  (Doc. 33 at 8,

SMITH-0044).  The Termination Notice indicates that Plaintiff was discharged for harassment and

termination "based on conduct after formal warning by RVP & DM" on March 15, 2007.  (Id.)

Plaintiff returned his keys but refused to sign the Termination Notice.  (Id.)  Plaintiff asserts that he

was terminated because Sunbelt wished to avoid a race discrimination lawsuit.  (Doc. 1).

The termination stemmed from Sunbelt's receipt of "an outside complaint of harassment."

(Doc. 1).  While Plaintiff did not know the source of the complaint at the time, Brown and Cook

testified that Plaintiff's termination arose from an incident involving Gary Fisher, a salesman for

RSC Equipment Rental, Inc., a competitor and vendor.  (Brown Dep. at 58; Cook Dep. at 13-16).

Fisher complained to Sunbelt, by calling Cook at his home, asserting that Plaintiff had been

"weaving in and out of traffic" in a Sunbelt vehicle in front of him while driving on an interstate

highway, and then harassed him when he drove close enough to his vehicle to touch and push or tap

10

it at an intersection.  (Cook Dep. at 8, 13-17; Bernard Dep. at 52-55).  Cook called Plaintiff's

immediate supervisor, Bernard, and informed him of the incident and the next day Sunbelt

management met and decided to meet with RSC's manager and regional vice-president to discuss

the incident and apologize for Plaintiff's behavior.[6]  (Id.)  Bernard consulted with Scott Causey in

Sunbelt's Human Resources Department as well as Brown, and the decision was made to terminate

Plaintiff for "unacceptable conduct after having already received a formal warning" (this would be

the second incident of misconduct after the March incident).[7]  (Id.)  Cook testified that with "an act

of this kind of conduct, we immediately decided termination[,]" adding that the prior March 2007

incident "did play a part[]" and that "[t]here w[ere] some previous incidents."  (Cook Dep. at 17).

Bernard testified that he considered this second incident to be "gross misconduct" because any

"bumper-to-bumper contact, forcing somebody out into an intersection could have resulted in an

injury."  (Bernard Dep. at 56, 62).  Bernard testified that Sunbelt's HR department told him that "we

could terminate with the information of the violation of the code and if . . . [Plaintiff] had questions

he needed to contact the HR department after the severance."  (Id. at 56-57).  Brown testified that

he was told that over the course of time, Plaintiff had harassed competitors, their mechanics and his

competitive sales reps, and that in July 2007 "he saw fit to have some dangerous interaction with

his vehicle[.]"[8]  (Brown Dep. at 56).  Plaintiff testified that he did not "bump" his vehicle into a

---

[6] Bernard testified that the RSC employees discussed other incidents, such as Plaintiff bumping their service trucks in a fast food restaurant drive-through line.  (Bernard Dep. at 54, 62).

[7] Bernard did not ask Plaintiff for his story because Plaintiff had already received a prior warning in March that was serious, and so he was terminated.  (Id.)  Cook testified that he did not ask Plaintiff what happened and to his knowledge, no one with Sunbelt did either.  (Cook Dep. at 16-17).

[8] Brown also testified that Plaintiff "did not display the level of professionalism that we expect of our employees[]" because "[h]e didn't treat people the way they should be treated . . . just in general[] . . . . a disrespectful way of dealing with other employees and just overall was a difficult person to be around

11

competitor's vehicle during his employment with Sunbelt.  (Plf's Dep. at 91).

**C.      Sunbelt Employee Information Handbook & Discipline**

Plaintiff asserts that Sunbelt disciplined Cooley under the Handbook differently than how he was disciplined, claiming that Cooley should have been terminated according to Sunbelt's zero tolerance policy for firearms and that he should not have been suspended for two days for the allegedly racially discriminatory remark.  (Plf's Dep. at 123-124).

Sunbelt's Employee Information Handbook (Revised 07/06) ("Handbook") outlines the company's policies and procedures regarding harassment and discrimination, as well as discipline. (Plf's Dep. at Def's Ex. 5 (SMITH 0073-0101)).  Sunbelt's Discharge and Discipline Policy ("Policy") provides that an individual's employment is "at will" – "either the employer or the employee may terminate employment relationship at any time, with or without cause."  (Id. at SMITH-0077, SMITH 0096-0097).  Sunbelt attempts to utilize progressive discipline which *may* involve verbal counseling and/or a written warning before an employee is terminated as follows: 1) First Violation-verbal warning; 2) Second Violation-written warning; 3) Third Violation-written warning with suspension or demotion; and 4) Fourth Violation-termination.  (Id. at SMITH-0096). The Policy explains that "exceptions or variations from this procedure may occur whenever the Company determines that termination is appropriate without prior written or verbal warning."  (Id.)

In the Section "Actions Which May Result in Warning Prior to Discharge," the Policy provides examples of conduct which *may* give rise to disciplinary action, or depending upon

---

and work with[;]" as example, Brown testified about an incident in January 2006 in which Plaintiff displayed poor conduct about part of his sales territory being assigned to another sales representative and after August 2006 when the company implemented a sales effectiveness program and he acted unprofessionally by embarrassing Brandy Reese in front of customers and employees "with many actions" in the manner in which he treated her.  (Brown Dep. at 13-19).

frequency and severity may result in demotion or termination, as follows:

> -inefficient performance of assigned duties and responsibilities;
> -unsatisfactory performance of any assigned duties and responsibilities;
> -excessive abstenteeism/tardiness and/or early departures (excused/unexcused);
> -failure to comply with safety rules and procedures;
> -failure to comply with other general policies and procedures as outline by the Company; accidents resulting in destruction of or damage to company property where the cause of the accident appears to be carelessness or negligence of the employee;
> -carelessness or negligence in the performance of assigned duties or in the care and use of company property;
> -harassment;
> -discourteous, rude or non-professional behavior or failure to interact courteously and tactfully with managers, co-workers, customers and/or vendors;
> -failing to report suspected criminal activity committed by another employee within a reasonable time; and
> -failing to maintain the security of confidential documents.

(Id. at SMITH 0096-0097).  In the Section "Actions Which May Result in Immediate Discharge,"

the Policy identifies actions for which an employee _may_ be subject to immediate dismissal:

> -insubordination;
> -breach of confidence;
> -falsification of records;
> -dishonesty/theft;
> -gross negligence or gross misconduct;
> -two consecutive work absences without prior approval and without calling;
> -solicitation;
> -using or being under the influence of non-prescription drugs, alcohol or other medication;
> -using or being under the influence of prescription drugs that inhibit or impair the employees ability to perform the essential functions of his/her job;
> -possessing firearms or other dangerous weapons on company property or in the course of job duties unless specifically allowed by state law;
> -using physical force against another employee, or making threats of violence or coercion directed toward managers, co-workers, customers and/or vendors;
> -failing to report first-hand knowledge of a criminal act committed by another employee within a reasonable time;
> -two preventable accidents within a rolling one-year period;
> -failure to properly report an accident immediately; and
> -attempting to conceal an accident or violation of company policy, or circumvent an investigation.

13

(Id.)

Bernard testified that while Sunbelt has a progressive discipline policy, "it's up to the actual offense and the context in which that offense happens . . . . somebody having a gun in their truck is not as severe as somebody pointing a gun at somebody's head[]" and [b]oth violate the same policy, but one would be immediate discharge." (Bernard Dep. at 30-31). While an action may be one "which may result in immediate discharge," it still depends on the context and "that is why it says 'may.'" (Id. at 31). Bernard believed that Plaintiff committed "gross conduct" in July 2007, even though there are incidents where an employee can commit gross misconduct and not be discharged (such as when Cooley violated Sunbelt's firearm policy but was given a written warning). (Id. at 31-32). Bernard testified about Cooley's discipline: "[t]he outcome was that he was given a written warning[.]" (Id. at 27). Bernard testified that Sunbelt's most minimal discipline is a verbal warning and that Cooley's incident was not "just taken lightly." (Id. at 49). Bernard testified that according to the Handbook, "y'all" and "what it is" is considered wrong as prohibited:

> epithets, slurs, jokes, stereotyping, use of offensive or inappropriate nicknames or intimidating acts based on a person's protected status. Verbal, written or implied threats of coercion. Harassment, unwelcome conduct whether verbal, physical or visual that is based upon a person's protected status such as sex, color, race, national origin, age, disability or other legally protected group.

(Bernard Dep. at 44, 47). Bernard testified that Sunbelt employees have been told not to use that type of language (and that the Handbook gives them fair warning) because "some individuals take words to mean certain things[] [and] [i]f it's used in a derogatory manner to an individual regardless of race, then it's a slur or a stereotype." (Id. at 45, 47). Brown testified that the problem with what Plaintiff said was "where it was said and how it was said and when it was said[]" with the key being that it was said to an African-American. (Id. at 31).

14

Sunbelt representative Cheryl Black testified about the March 2007 incident: Cooley thought that Plaintiff had referred to him in a derogatory term of "y'all" or "y'all people" based on his race, stereotyping on his race and so complained that Plaintiff said "that's how y'all people talk." (Black Dep. at 18). Black testified that she believes that the use of the word "y'all" or "y'all people" is covered under the section of the Handbook that prohibits "epithets, slurs, jokes, stereotyping, use of offensive or inappropriate nick-names or intimidating acts that are based on a person's protected status." (Id. at 20). Black testified that the word "y'all" becomes derogatory "depending on the context" and that from her reading of the witness interviews and the Warning Form with regard to the March 2007 incident, it appeared that Plaintiff's intent was to talk to Cooley in a derogatory manner. (Id. at 22, 24). Black testified that use of the phrase "what it is" – especially in the South – is "typically from the blacks[,]" such that it would have a racial context especially when followed by "y'all talk like that, dontcha." (Id. at 28).

## II.   Analysis

## A.   Applicable Law

Summary judgment should be granted only if "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).[9] The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."

---

[9] Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted:

> if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(c).

15

Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The party seeking summary judgment always bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment.  Celotex, 477 U.S. at 323.  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted).  The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment.  Lofton v. Secretary of Dep't of Children & Family Serv., 358 F.3d 804, 809 (11th Cir. 2004), cert. den., 534 U.S. 1081 (2005).

    This case is a discriminatory discipline action.  A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or through statistical proof.  See, e.g., Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1322-1323 (11th Cir. 2006); Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990). Where a plaintiff relies on circumstantial evidence of discrimination, courts evaluate whether summary judgment is appropriate using the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981).  Under the McDonnell Douglas framework, a plaintiff must show an inference of discriminatory intent, and therefore carries an initial burden of establishing a *prima facie* case of discrimination.  Id. at 802. Presenting a *prima facie* case requires that the plaintiff establish facts adequate to permit an inference of discrimination.  Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).  The successful assertion of a *prima facie* case then "creates a rebuttable presumption that the employer unlawfully discriminated against" the plaintiff.  E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002).  If this occurs, and a *prima facie* case of discrimination is presented, the burden of producing evidence that the employer's action was taken for a legitimate, non-discriminatory reason then shifts to the employer.  Id.  See, e.g., Holifield, 115 F.3d at 1564. A defendant must only identify a nondiscriminatory basis, not prove it.  Coutu v. Martin Cty. Bd. of Cty. Comm'rs, 47 F.3d 1068, 1073 (11th Cir. 1995).  In the last step of the burden-shifting analysis, if the employer meets "its burden of production, the presumption of discrimination is rebutted, and the inquiry 'proceeds to a new level of specificity,' in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination."  Joe's Stone Crabs, 296 F.3d at 1272-1273.  See also Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997).

To establish the elements of a *prima facie* race discrimination case under McDonell Douglas, the plaintiff must show that: 1) he is a member of a protected class; 2) he suffered an adverse employment action; 3) the employer replaced him with a person of another group or treated him less favorably than a similarly situated individual of another group; and 4) he was qualified for the position.  See, e.g., Burke-Fowler, 447 F.3d at 1323; Wilson v. Bailey, 934 F.2d 301, 304 (11th Cir. 1991).  When a plaintiff alleges discriminatory discipline, to determine whether employees are

similarly situated, courts evaluate whether the employees are involved in or accused of, at the least, the same or similar conduct, and yet are disciplined in different ways.[10] Burke-Fowler, 447 F.3d at 1323; Anderson v. WBMG-42, 253 F.3d 561, 564 (11th Cir. 2001); Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999) (holding that the conduct should be "nearly identical").[11] As noted in Moore v. Alabama Dep't of Corrections, 137 Fed. Appx. 235, 238 (11th Cir. 2005):

> . . . . the plaintiff must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct.

To compare his treatment to that of other employees, a plaintiff must show that his comparators are similar "in all relevant respects." Holifield, 115 F.3d at 1564. See, e.g., Silvera v. Orange County School Bd., 244 F.3d 1253, 1259 (11th Cir. 2001); Evans v. Alabama Dep't of Corrections, 418 F. Supp.2d 1271, 1278 (M.D. Ala. 2005). Indeed, "[w]e require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Maniccia, 171 F.3d at 1368. See also Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1280 (11th Cir. 2008); Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984). The most important variables in a discriminatory discipline case are the nature of the offenses committed and the nature of the punishments imposed, and a plaintiff must show that "the disciplinary measures enforced against

---

[10] The employees must be "similarly situated in all aspects." Roy v. Broward Sheriff's Office, 160 Fed. Appx. 873 (11th Cir. 2005); Holifield, 115 F.3d at 1563. See also e.g., Bennett v. Chatham County Sheriff Dept., Slip Copy, 2008 WL 4787139, *5 (11th Cir. 2008).

[11] The Eleventh Circuit held in Cuevas v. American Exp. Travel Related Services Co., Inc., 256 Fed. Appx. 241, 243 (11th Cir. 2007) that "[a]lthough the 'nearly identical' misconduct requirement was called into question by Alexander v. Fulton County, Ga., 207 F.3d 1303, 1334 (11th Cir.2000), we are 'bound to follow Maniccia's 'nearly identical' standard rather than the standard articulated in Alexander because when a later panel decision contradicts an earlier one, the earlier panel decision controls.'"

him were more severe than those enforced against the other person who engaged in similar misconduct." Jones v. Gerwen, 874 F.2d 1534, 1540 (11th Cir. 1989). In sum, in determining whether employees are similarly situated for purposes of establishing a *prima facie* case, a plaintiff cannot assemble a comparator out of vague and conclusory allegations; rather, it is necessary to consider whether the employees were involved in, or accused of, the same or similar conduct yet were disciplined in different ways. Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1311 (11th Cir.), *opinion modified by* 151 F.3d 1321 (11th Cir. 1998); Evans, 418 F. Supp. 2d at 1278.

## B. Application

As noted *supra*, Plaintiff asserts that he suffered unequal treatment, disparity and discrimination due to his race (Caucasian) because his discipline by Sunbelt was "done . . . in an extremely unfair and racially discriminatory manner, as similarly situated African-American employees, including Cory Cooley, were not punished for similar or worse alleged misconduct." (Doc. 1).

Sunbelt asserts that Plaintiff cannot establish his *prima facie* case for discriminatory discipline due to the absence of a valid comparator, and further, that Sunbelt had legitimate non-discriminatory reasons for disciplining and terminating him. The Court finds that summary judgment is due to be granted in favor of Sunbelt because even assuming Plaintiff's allegations are true for purposes of this motion,[12] the fact remains that Plaintiff cannot identify another Sunbelt employee who engaged in the same or similar conduct but who was disciplined differently (*i.e.*, a valid comparator). Accordingly, Plaintiff cannot establish a *prima facie* case.

---

[12] In other words, even assuming that the parties cannot agree on exactly what was said between Plaintiff and Cooley (whether that was "y'all" and/or "y'all people" or some combination of "you people," "y'all" or "y'all people" with "what it is"), the appropriate discipline levels of the Sunbelt policy, and/or whether Plaintiff even said anything racially discriminatory.

For purposes of this motion, there is only one contested element of Plaintiff's *prima facie* case: whether a similarly situated, African-American employee committed the same violation as Plaintiff, a Caucasian employee, but did not suffer the same adverse employment action.  See, e.g., Holifield, 115 F.3d at 1562.  Plaintiff cannot support a *prima facie* case simply by disputing his violation of a Sunbelt rule or policy; rather, he must produce evidence to show that a similarly-situated African-American employee was, in fact, treated better for violating the very same rule or policy.  Jones, 874 F.2d at 1540; Cooper, 390 F.3d at 729.  In attempting to meet his *prima facie* burden, Plaintiff has brought forward evidence of only one potential comparator: Cory Cooley, an African-American employee (a driver) of Sunbelt.  Plaintiff contends that he and Cooley are comparators to establish a requisite element of his *prima facie* case for race discrimination because *they were disciplined differently for facts "arising out of the same report[.]"* (Doc. 32 at 10 (emphasis added)).  Plaintiff alleges that there is sufficient evidence to establish the comparator prong of his *prima facie* case because "there is sufficient evidence establishing that . . . out of two work place, policy violations *arising out of the same incident*, the white employee received substantial punishment for a highly questionable grounds, and the African-American employee received very minimal punishment."  (Id. at 12 (emphasis added)).

The Plaintiff presents no specific argument or evidence in support of his allegation in the complaint that his termination in July 2007 was discriminatory based on his race.[13]  Rather the Plaintiff states that he "is not disputing at this point the July, 2007 incident, but does dispute the motive and the nature of the March, 2007 warning and suspension, which the Plaintiff believes was racially motivated, discriminatory, and ultimately led to his termination."  The insinuation is that

---

[13] This may be because, according to Plaintiff, Cooley was also terminated at some point.

but for the wrongful March 2007 discipline, Plaintiff would not have been terminated for the July 2007 complaint that Plaintiff used his vehicle (*i.e.*, bumper to bumper contact) to harass a competitor. While there is evidence that the March 2007 incident was taken into account when considering the discipline for the July 2007 incident, there is no evidence that the disciplinary action taken in July 2007 was discriminatory. Accordingly, the Court's analysis is confined to the March 2007 incident.

Plaintiff's argument is rooted in the March 2007 incident, when Cooley was caught with a firearm in his vehicle and then, while being disciplined, complained that Plaintiff had used a racial remark earlier in the day. Cooley was given a warning even though the Handbook lists having a gun on company property as a violation which *may* result in immediate discharge, whereas Plaintiff was given a two-day suspension for violating the company's harassment and discrimination policy. While it is true that both Plaintiff and Cooley's conduct were referenced in the same report, any "similarity" between the two ends there. Specifically, the conduct at issue was distinct. Plaintiff's conduct was a remark made to Cooley in violation of the company's harassment and/or discrimination policy. Cooley's conduct was a violation of the company's firearms policy. This difference in conduct is fatal to Plaintiff's *prima facie* case. Indeed, regardless of the type or level of discipline exacted, Plaintiff was not involved in, or accused of, the same or similar (or nearly identical, for that matter) conduct as Cooley, and yet disciplined in a different way. Rather, Plaintiff and Cooley were involved in, or accused of, different conduct, and were disciplined in different ways. See Holifield, 115 F.3d at 1562. The most important factors in a comparator analysis in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed: "the comparator's misconduct must be nearly identical to the plaintiff's in order to prevent

courts from second-guessing employers' reasonable decisions and confusing apples with oranges."

Silvera, 244 F.3d at 1259.  See also Phillips v. Aaron Rents, Inc., 262 Fed. Appx. 202 (11th Cir.

2008).  A review of the record satisfies this Court that Cooley, an African-American, was not

sufficiently similarly situated (i.e., not similar or nearly identical conduct) to be a valid comparator

for Plaintiff, a Caucasian.  In sum, these are completely different acts of conduct, each of which

called for different discipline.  See, e.g., Jones v. Alabama Power Co., 282 Fed. Appx. 780 (11th Cir.

2008) (unpublished).[14]

Additionally, Plaintiff alleges that other employees (including Cooley) commonly use the

phrase "y'all" in talking with one another at work, and that Cooley has used the phrase as well as

"what it is" but that no other employees have been disciplined for using these phrases.  (Plf's Dep.

at 138, 254-259; Plf's Affidavit).  Even assuming that Cooley has used the phrase "y'all" and "what

it is" at work, Plaintiff has not provided evidence that any complaints were made to Sunbelt against

Cooley or any other employee concerning the use of the words in a derogatory or demeaning

---

[14]  See also e.g., Bennett v. Chatham County Sheriff Dept., Slip Copy, 2008 WL 4787139, *5-6 (11th Cir. Nov. 4, 2008); Rioux, 520 F.3d at 1280-1281 (finding that no valid comparator existed to establish that plaintiff's race discrimination case); Mathis v. Leggett & Platt, 263 Fed. Appx. 9, 13 (11th Cir. 2008) (concluding that plaintiff had not pointed to similarly situated comparators who were treated more favorably under company policy to establish a prima facie case); Shortz v. Auburn University at Montgomery, 274 Fed. Appx. 859, 861 (11th Cir. 2008) (unpublished) (finding that the plaintiff had not made a prima facie case of race discrimination because he did not have a valid comparator); Jackson v. Winn-Dixie, Inc., Slip Copy, 2008 WL 5435576 (S.D. Ala. Dec. 31, 2008); Robinson v. LaFarge North America, Inc., 240 Fed. Appx. 824, 828 (11th Cir. 2007) (unpublished) (concluding that plaintiff was not similarly situated with the other identified employees, as the other employees were not engaged in nearly identical conduct); Hendrix v. Snow, 170 Fed. Appx. 68, 78 (11th Cir. 2006) (unpublished); Austin v. City of Montgomery, 196 Fed. Appx. 747, 750 (11th Cir. 2006) (unpublished) (concluding that plaintiff failed to establish racially discriminatory disparate treatment because she did not proffer any evidence showing that a co-worker engaged in or was accused of similar misconduct); Samuels v. University of South Alabama, 153 Fed. Appx. 612, 614 (11th Cir. 2005) (unpublished); Cooley v. Great Southern Wood Preserving, 138 Fed. Appx. 149, 157-158 (11th Cir. 2005) (unpublished) (stating that the absence of evidence showing that a similarly situated, non-protected employee had been treated differently means that plaintiffs could not establish a proper comparator); Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1319 (11th Cir. 2003).

manner.  In short, there is nothing in the record indicating that Cooley engaged in misconduct "similar" or "nearly identical" to Plaintiff's relevant conduct.

Moreover, Plaintiff alleges that "other evidence has been presented establishing a clear history of special and unfair treatment afforded to African-Americans at the Sunbelt workplace[]" referencing the Affidavit of Bruce Lott and Plaintiff's testimony that throughout his employment Cooley "received preferential treatment and discipline was ignored for numerous policy violations, including . . . violent outbursts, threats to supervisors, etc." (Doc. 32 at 12).  Plaintiff has also made vague allegations about "another" African-American driver's conduct at work and noncompliance with the Handbook, yet he has not specifically identified any other Sunbelt employee (other than Cooley) as a comparator or presented any evidence in support of his allegations (apart from the allegations set forth in Bruce Lott's Affidavit).  However, Lott did not assert that any African-American employees *(or any other employees for that matter)* made a similar discriminatory or harassing remark and yet was not disciplined or disciplined in a different way.  The conduct, again, is distinct, and as such, not comparable.  The same holds true for Plaintiff's allegations and testimony about the conduct of other African-American employees (including Cooley) related to falsifying time cards, use of company vehicles, failing to show up for work, making outbursts, etc.  Put simply, Plaintiff has not shown that another Sunbelt employee engaged in similar or nearly identical conduct but was disciplined differently by Sunbelt.

Further, there is no dispute that Plaintiff and Cooley did not have a similar rank or similar job responsibilities.  Material differences in rank and job responsibilities can also preclude a co-employee from being a valid comparator.  See, e.g., Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1281 (11th Cir. 2008); Aaron Rents, Inc., 262 Fed. Appx. at 208.  Plaintiff was an OSR, who

received salary and commissions based on his ability to bring in business for Sunbelt, whereas Cooley was a company driver who earned an hourly wage and was responsible for loading, delivering and picking up equipment.  Clearly, Plaintiff and Cooley had different ranks and different job responsibilities.  This fact contributes to the conclusion that Cooley is not a valid comparator.  The same finding holds true for the other African-American employees (drivers) with whom Plaintiff appears to – vaguely – endeavor to compare his conduct.

In sum, summary judgment is due to be granted in favor of Sunbelt because Plaintiff has not identified any other Sunbelt employee – including Cooley – who made a racially discriminatory remark to a co-employee or who engaged in similar conduct from which to establish a *prima facie* case of race discrimination.  See, e.g., Holifield 115 F.3d at 1563; Richardson v. Alabama Pine Pulp Co., Inc., 277 Fed. Appx. 907 (11th Cir. 2008) (unpublished); Shortz v. Auburn Univ. at Montgomery, 274 Fed. Appx. 859 (11th Cir. 2008) (unpublished); Mathis, 263 Fed. Appx. 9; Aaron Rents, Inc., 262 Fed. Appx. 202; Cuevas v. American Exp. Travel Related Services Co., Inc., 256 Fed. Appx. 241 (11th Cir. 2007) (unpublished); Morris v. Potter, 251 Fed. Appx. 667 (11th Cir. 2007) (unpublished); Nicholas v. Board of Trustees of the Univ. of Ala., 251 Fed. Appx. 637 (11th Cir. 2007) (unpublished); Sumerlin v. AmSouth Bank, 242 Fed. Appx. 687 (11th Cir. 2007) (unpublished).[15]  And because Plaintiff cannot establish a *prima facie* case, the Court need not

---

[15] As noted in Lee v. Mid-State Land & Timber Co., Inc., 285 Fed. Appx. 601, 607 (11th Cir. 2008) (unpublished), if a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present.  See also e.g., Morris v. Emory Clinic, Inc., 402 F.3d 1076, 1082 (11th Cir. 2005) (finding that a doctor discharged from a clinic due to patient complaints about his conduct, who couldn't show that he was replaced by someone outside his protected class and who couldn't show that a comparable person outside his protected class, received "nearly identical" complaints, but was not fired failed to establish a *prima facie* case); Silvera, 244 F.3d at 1259 (reversing judgment in favor of plaintiff because employer entitled to judgment as a matter of law where plaintiff's comparator engaged in fewer instances of misconduct than plaintiff); Holifield 115 F.3d at 1563 (affirming summary judgment where plaintiff failed to produce sufficient evidence that

address whether Sunbelt has articulated a legitimate, non-discriminatory reason for the employment decision.  See, e.g., Hendrix v. Snow, 170 Fed. Appx. 68, 78 (11th Cir. 2006) (unpublished); Samuels v. University of South Alabama, 153 Fed. Appx. 612, 614 (11th Cir. 2005) (unpublished); Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1319 (11th Cir. 2003).

## III.   Conclusion

Based upon the foregoing, the Court finds that Defendant Sunbelt's Motion for Summary Judgment is due to be **GRANTED.**

**DONE** and **ORDERED** this the **14**th day of **April, 2009.**

 /s/ **Kristi K. DuBose**

**KRISTI K. DUBOSE**
**UNITED STATES DISTRICT JUDGE**

---

non-minority employees with which he compares his treatment were similarly situated in all aspects, or that their conduct was of comparable seriousness to the conduct for which he was discharged); Nix, 738 F.2d at 1185-1187 (concluding that an African-American plaintiff who was replaced by another African-American after termination for violation of a work rule failed to make out a *prima facie* case of race discrimination because he did not show that a white employee in similar circumstances was retained while he was fired).